U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

AUG 1 8 2005

ROBERT H. SHEMWELL, CLERK
BY _____ DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

| | |
|---|---|
| LINDA FREEMAN | CIVIL ACTION NO. 04-1909 |
| VERSUS | JUDGE DRELL |
| COMMISSIONER OF SOCIAL SECURITY | MAGISTRATE JUDGE KIRK |

## REPORT AND RECOMMENDATION

This case comes before the Court for a review of the final decision of the Commissioner of Social Security ("Commissioner"), denying Linda Freeman ("Freeman") Disability Insurance Benefits ("DIB") under the Social Security Act ("SSA"). The issue to be decided is whether substantial evidence in the record supports the finding of the Administrative Law Judge ("ALJ") that Freeman is not disabled and thus not entitled to disability insurance benefits.

Freeman was thirty-five years old at the time of the ALJ's decision. She has a high school education plus three years of college (Tr. 11), and has past work experience as a bank manager, customer service representative, teller and cashier (Tr. 11, 133). She filed an application for DIB on August 28, 2002, alleging a disability onset date of August 15, 2002, due to fibromyalgia, hypothyroidism, lymphedema in the lower extremities, and depression. (Tr. 11, 95.) Freeman's claim was denied initially, and a request for hearing was timely made. A hearing was held and a decision unfavorable to the claimant was rendered on January 27, 2004.

To qualify for DIB, a claimant must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. § 416(i), 423. Establishment of a disability is contingent upon two findings. First, a claimant must suffer from a medically determinable physical or mental impairment that can be

expected to result in death, or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C.§ 423 (d)(1)(A). Second, the impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

## Scope of Review

In considering Social Security appeals such as the one that is presently before the Court, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether the decision comports with relevant legal standards. McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999). For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994), citing Richardson v. Perales, 402 U.S. 389, 401 (1971). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision but must include a scrutiny of the record as a whole. The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight. Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, re-weigh evidence, or substitute its judgment for that of the fact-finder. See Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court. See Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981). The court does have authority, however, to set aside factual findings which are not supported by substantial evidence and to correct

errors of law. See Dellolio, 705 F.2d at 125. But, to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence." Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988); Dellolio, 705 F.2d at 125.

## Issues

Freeman raises the following issues for review:

(1) Whether the ALJ erred in discounting Dr. Sandifer's opinion; and

(2) Whether the ALJ erred in finding that Freeman retained the residual functional capacity for a significant range of sedentary work.

## Factual Background

The record contains treatment notes from John P. Harris, M.D., an internist, from August 2001 through August 2002. (Tr. 169-186.) In August 2001, Dr. Harris called in refills of Soma and Lorcet. A prescription for Xanax and Lorcet was issued in September 2001, and in October 2001, refills of Celexa, Lorcet, Xanax, and Soma were authorized. (Tr. 186.) Freeman reported that she wanted to try Neurontin and Klonopin. (Tr. 184.) Also in October, Freeman complained of sore muscles and cramps in her legs. Her right ankle was slightly swollen. Dr. Harris prescribed Neurontin and Klonopin as well as Lorcet and OxyContin. (Tr. 184.) Later that month, Freeman asked if she could increase her dosage of Neurontin from 100 mg to 300 mg, and the doctor so ordered. (Tr. 183.) On October 29, 2001, Freeman reported improvement, but was still having pain in her knees and ankle. Examination revealed positive trigger points, mild effusion in the left knee, and mild tenderness in the knees and ankles. (Tr. 182.) Dr. Harris increased Freeman's OxyContin to three times a day (Tr. 182); in November, the OxyContin was increased again, pursuant to

Freeman's request (Tr. 181).

On November 28, 2001, Freeman was tearful at her visit with Dr. Harris and reported that she was not doing well. (Tr. 180.) Her husband stated that she was "like a zombie" because of all of the medications she was taking. Freeman reported continued pain and mood swings. (Tr. 180.) Examination of the neck was normal, and she was neurologically intact. Dr. Harris suspected that depression was the main problem, not fibromyalgia. (Tr. 180.) A number of medications were discontinued, including Soma, Neurontin, Xanax, Ambien, and Allegra. (Tr. 179.) Freeman was instructed to continue Celexa, Trazadone, Klonopin, and Synthroid, and OxyContin was decreased to twice a day. (Tr. 179.) Freeman was referred for a psychiatric evaluation, which was performed that same day. The psychiatrist, Dr. Baratang, diagnosed major depressive disorder, recurrent, moderate. He increased Celexa to 40 mg and Klonopin to .75 mg at bedtime. (Tr. 200-205.)

On November 29, 2001, Freeman returned to Dr. Harris with an "appropriate affect" and in no apparent distress. (Tr. 178.) On December 11, 2001, Freeman reported to Dr. Baratang and was doing a bit better. (Tr. 199.) In January 2002, Dr. Baratang noted that Freeman was still doing better and was able to function at her job and with household duties. (Tr. 199.) A sleep study showed lack of deep sleep and predominance of light sleep. She acknowledged poor concentration and low grade anxiety. (Tr. 199.) In March, Freeman reported that her medications were helping with nocturnal pain and sleep. (Tr. 198.) She reported that she had been fired from her job at a bank the week before, purportedly because she was not doing her work effectively. (Tr. 198.) However, she was now working as a Mary Kay representative.

Freeman continued to take OxyContin as prescribed by Dr. Harris. (Tr. 174-176). Examination of joints and muscles was normal in March 2002. She was also prescribed Imitrex for

4

migraine headaches. (Tr. 173.) She was feeling well on March 21, 2002, and reported that she was fired from one job, but had a new job. (Tr. 172.) Dr. Harris recommended that Freeman take a brisk walk for fifteen minutes a day and hold off on taking muscle relaxers. (Tr. 172.) She was referred to Dr. Katz, a pain management specialist.

Freeman was evaluated by Mohammad I. Shbeeb, M.D., a rheumatologist, on April 22, 2002. (Tr. 166-167.) Physical examination was consistent with a diagnosis of fibromyalgia. There was no evidence to diagnose connective tissue disease. Dr. Shbeeb found an elevated sedimentation rate, which could have been caused by a recent sinus infection. No treatment was recommended, but Dr. Shbeeb stated that he would repeat inflammatory markers once Freeman was over her sinus infection. (Tr 166.) Dr. Shbeeb recommended that Freeman follow up with Dr. Katz regarding fibromyalgia and chronic pain. (Tr. 166.) Freeman returned to Dr. Shbeeb on May 13, 2002, with complaints of right elbow pain and swelling of lower extremities. (Tr. 165.) Dr. Shbeeb recommended that Freeman discontinue Celebrex, as that may be causing swelling. She received a corticosteroid injection for right epicondylitis and a prescription for Lasix. (Tr. 165.) Freeman complained of swelling on June 24, 2002. Dr. Shbeeb recommended that Freeman follow up with her treating physician regarding her fibromyalgia. (Tr. 165.) He treated Freeman with Demadex and potassium for her lower extremity edema and referred Freeman to Dr. David for an evaluation regarding that impairment. (Tr. 164.)

Freeman reported to Dr. Baratang in May 2002 that she was benefitting from her medications. (Tr. 197.) That same month, she complained to Dr. Harris of swelling in the feet. Examination revealed trace pedal edema and symptoms of sinusitis for which Allegra was prescribed. (Tr. 170.)

5

Freeman reported back to Dr. Katz on May 28, 2002, feeling somewhat dejected. Her pain medication was changed to Methadone, and Freeman was prescribed Baclofen for muscle relaxation, as well as Wellbutrin. (Tr. 189.) In June 2002, Freeman was doing reasonably well on her new medications.

On August 15, 2002, Freeman reported severe problems with fibromyalgia and pain such that she could no longer work. (Tr. 169.) Dr. Harris referred Freeman back to Dr. Baratang, opining that she should seek disability. (Tr. 169.) Dr. Baratang saw Freeman the same day, and Freeman reported an increase in depression. He suggested that Freeman resume Provigil. (Tr. 196.)

Freeman reported to Dr. Katz four days later. She was no longer taking Provigil, which had helped in the past. Dr. Katz discontinued Wellbutrin and prescribed Provigil as well as Soma. (Tr. 187.) Dr. Katz opined that, overall, Freeman was doing reasonably well, and should benefit from having her medications adjusted. (Tr. 187.)

On September 27, 2002, a chiropractor, Gary Swart, submitted a report stating that he had treated Freeman intermittently over the past few years, and most recently, three weeks prior to his report. (Tr. 192.) She had a history of fibromyalgia that had increased in the past six to ten months. (Tr. 192.) Examination revealed 20-40% loss of range of motion in all planes, a slight decrease of L5 and S1 dermatome bilaterally, and 16/17 positive fibromyalgia points. All other neurological tests were essentially normal. (Tr. 192.) She had difficulty sitting and standing for prolonged periods of time. The chiropractor believed that Freeman would have extreme difficulty performing work related activities, would be able to sit, walk, or stand for only short periods of time, and would be unable to lift, handle, or carry anything over five pounds periodically throughout a normal work day. (Tr. 192.)

Dr. Baratang found that Freeman was doing better on October 1, 2002. (Tr. 196.) She was sleeping better and more awake during the day, had increased energy level, and was more able to get things done. No abnormal findings were noted and no changes in treatment were recommended. (Tr. 196.) By November 2002, she had more stable moods and was not taking as much pain medication. (Tr. 195.) Diagnoses were major depression and fibromyalgia improving with medication. (Tr. 195.)

A consultative mental status examination was performed by Rebecca Nolan, Ph.D., M.S.C.P., on November 23, 2002. (Tr. 219-222.) Some concentration problems were noted. Dr. Nolan recommended that Freeman see a therapist for assistance with emotional functioning. (Tr. 222.) She found that Freeman functioned within the average range of intelligence. (Tr. 221.) Dr. Nolan opined that Freeman's physical problems would require ongoing assistance, and it was unlikely that Freeman could be employed. (Tr. 222.)

A consultative orthopedic evaluation was performed on December 10, 2002, by Dr. John P. Sandifer. (Tr. 223-225.) Freeman claimed that she had to quit her job at a bank because of swelling and pain in her knees. She also reported that her hands swell and she cannot tolerate cold, wet weather. (Tr. 223.) Examination revealed a normal gait, and some tenderness at the base of the cervical spine, right scapula, and shoulders. She had positive impingement signs bilaterally, and negative Tinel's and Phalen's tests bilaterally. (Tr. 224.) There was full range of motion of both hips and mild swelling of the knees. X-rays of the cervical spine showed a moderate decrease in disc space at C4-5 and C5-6, and x-ray of the lumbar spine showed degenerative changes at L5-S1. (Tr. 224.) Diagnoses included fibromyalgia, degenerative disc disease, progressive inflammatory arthritis of undetermined type, and chronic swelling and lymphedema of both lower extremities. (Tr. 224.)

Dr. Sandifer opined that Freeman could not do any overhead lifting, and could lift 5-10 pounds below shoulder level. The doctor opined that Freeman could not sit for more than 3 hours in an 8-hour day, or more than 30 minutes at a time, and could not stand for more than 4 hours in an 8-hour day or more than 30-45 minutes at a time. He opined that Freeman should avoid the extremes of cold temperatures. (Tr. 224.) Freeman could not do repetitive stooping, crawling or climbing.

Jonathan Forrester, M.D., began treating Freeman in January 2003. (Tr. 265-320.) Dr. Forrester referred Freeman to Dr. Gerald LeGlue. Dr. LeGlue noted that Freeman's MRI's and other work-ups were negative for significant pathology. (Tr. 301.) Examination was consistent with myofascial pain syndrome. Dr. LeGlue recommended that Freeman be evaluated by an acupuncturist and begin a Tai Chi program and possibly water therapy. (Tr. 301.) The record does not reflect that Freeman followed through with those recommendations. Dr. Forrester prescribed Methadone for pain. Freeman had great improvement by June 2003. She had an essentially normal sleep study that month, and the doctor performing the study opined that Freeman may be taking too much medication. (Tr. 300.)

Dr. Forrester referred Freeman to Dr. David Kline of the Department of Neurosurgery with the LSU Healthcare Network. (Tr. 297-298.) Dr. Kline noted that Freeman reported a history of pain, but there was no history of trauma. Dr. Kline opined that Freeman needed to lose weight and needed to work out her arms in water. (Tr. 297.) Dr. Kline conducted an EMG, which revealed normal findings. Freeman reported lymphedema in her legs, but Dr. Kline saw no evidence of same. Dr. Kline noted that Freeman claimed that her symptoms prevented her from working; however, Dr. Kline did not provide such an opinion. (Tr. 298.)

In February 2003, Dr. Hussein Alammar performed a consultative internal medicine

8

examination. (Tr. 227-232.) Freeman reported taking seventeen different medications. She met the criteria for fibromyalgia, having 13 of 18 positive tender points. (Tr. 232.) Freeman appeared in no acute distress, with regular pulse and blood pressure. (Tr. 230.) There was no spinal tenderness or costovertebral angle tenderness. Range of motion of the dorsolumbar spine was intact. Freeman claimed that she could not squat because of her knees. (Tr. 230.) Deep tendon reflexes were 2/2 bilaterally, and her gait was normal. Heel and toe walking was difficult. (Tr. 231.) Dr. Alammar opined that Freeman's fibromyalgia was moderate, but noted that Freeman had no difficulty transferring from a sitting to supine position. (Tr. 232.) The doctor stated that an adjustment of Synthoird might help with Freeman's alleged fatigue and other symptoms. He did not identify any vocational limitations. (Tr. 232.)

In September 2003, Dr. Carl Goodman performed a spinal evaluation. Freeman was alert, cooperative, and in no distress. (Tr. 321.) Freeman had limited movements of the cervical spine due to pain. There was no spasm or deformity, some tenderness along the medial gore of the scapula, and a negative Spurling test. (Tr. 321.) Motor strength was 5/5 and there were no sensory defects. Dr. Goodman reviewed x-rays, noting mild disc bulges at C5 and C6. Diagnostic impression was degenerative cervical disc disease with neck and right arm pain and fibromyalgia. (Tr. 322.)

In August 2003, Freeman was off all antidepressants except Effexor. (Tr. 270.) Dr. Forrester opined in October 2003, that TOC may be a factor in Freeman's fibromyalgia pain. (Tr. 269.) Methadone was refilled and Flexeril and Elavil were prescribed. (Tr. 269.) Dr. Forrester did not suggest any limitations based on his findings, nor did he offer an opinion regarding Freeman's disability status.

Issue No. 1: Whether the ALJ erred in discounting Dr. Sandifer's opinion

First, Freeman argues that the ALJ failed to properly credit Dr. Sandifer's opinion that Freeman could not sit for more than 3 hours in an 8-hour day or more than 30 minutes at a time, and could not stand for more than 4 hours in an 8-hour day or more than 30-45 minutes at a time. (Tr. 224.) Freeman argues that an RFC as set forth in Dr. Sandifer's report should result in a finding that Freeman is unable to perform any work and is therefore disabled. Dr. Sandifer's opinion accounts for a total of seven hours of sitting and standing in an 8 hour day. The ALJ noted, "Dr. Sandifer places fairly significant restrictions on the claimant's ability to sit, stand and walk.... Limitations in this regard are poorly supported and inconsistent with the paucity of objective clinical findings reported on physical examination." (Tr. 17-18.)

Dr. Sandifer apparently relied heavily on Freeman's complaints of pain and accounts of swelling in the lower extremities. Part of his impression was "chronic swelling and lymphedema both lower extremities," yet he noted "no definite pitting edema in the lower extremities" upon examination. (Tr. 224.) Dr. Sandifer also relied on Freeman's statement that she had been diagnosed with some form of arthritis of an undetermined type. As the ALJ noted, such a diagnosis is not confirmed by the record. (Tr. 18.) Dr. Sandifer opined that Freeman could not stand for over 30 to 45 minutes at a time, but objectively, he found that Freeman had a normal gait and did not need a cane or crutch to help with ambulation. (Tr. 223.) Finally, Dr. Sandifer opined that Freeman would have to avoid the extremes of cold temperatures, based solely on Freeman's statement to him that she could not tolerate cold, wet weather. (Tr. 223-224.)

The ALJ is entitled to determine the credibility of medical experts as well as lay witnesses and weigh their opinions accordingly. See Scott v. Heckler, 770 F.2d 482, 485 (5th Cir. 1985). The

10

ALJ may disregard statements that are brief and conclusory, that are not supported by medically acceptable clinical laboratory techniques, and that are otherwise unsupported by the evidence. See Greenspan v. Shalala, 38 F.3d 232, 237 (5th Cir. 1994). Sandifer's findings regarding Freeman's ability to sit and stand and regarding her need to avoid cold weather are conclusory and not supported by substantial evidence. Additionally, the Court notes that Dr. Sandifer was a non-treating physician who performed a consultative examination.[1]

The ALJ has the responsibility for deciding a claimant's residual functional capacity. 20 C.F.R. § 404.1546. Such an assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence. SSR 96-05. When making the RFC determination, an ALJ must consider objective medical facts, diagnoses and medical opinion based on such facts, and subjective evidence of pain or disability testified to by the claimant or others. 20 C.F.R. § 404.1545(a).

Freeman argues that there is no evidence in the record to suggest that her RFC should be less restrictive than Dr. Sandifer's opinion. Here, the ALJ actually found a slightly *more* restrictive RFC regarding Freeman's ability to stand and/or walk (2 hours) than did Dr. Sandifer (4 hours). (Tr. 23.) However, the ALJ determined that Freeman could sit for 6 hours as opposed to Dr. Sandifer's

---

[1] In Myers v. Apfel, 238 F.3d 617, 621 (5th Cir. 2001), the Fifth Circuit stated it has long held that ordinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability.

11

opinion that she could sit for only 3 hours. (Tr. 23.) No other examining or consulting physician offered an opinion as to what work activities Freeman could or could not perform.

As noted herein, finding substantial evidence must include a scrutiny of the record as a whole. Here, the record, as a whole, supports the Commissioner's decision regarding Freeman's ability to sit and stand, and there is no indication that the ALJ improperly discredited Sandifer's opinion. Examination of joints and muscles by Dr. Harris revealed normal findings in March 2002. Dr. Alammar examined Freeman and noted normal gait, no spinal tenderness, and no sensory or motor deficits. (Tr. 230-232.) A March 25, 2003, MRI of the lumbosacral spine was "normal." (Tr. 294.) A July 28, 2003, EMG study was also within normal limits. (Tr. 297.) Dr. Goodman examined Freeman in September 2003, noting only limited movements of the cervical spine without spasm or deformity. (Tr. 321.) Motor strength was 5/5 and there were no sensory defects. Dr. Goodman reviewed x-rays, which revealed only mild disc bulges at C5 and C6. Dr. Harris suspected that depression was the main problem, not fibromyalgia (Tr. 180), and by 2003, Freeman was off of all anti-depressants other than Effexor. A reading of the ALJ's lengthy decision shows that he properly considered, but ultimately rejected, a portion of Dr. Sandifer's opinion, thereby giving the opinion limited weight. The Social Security Act empowers the ALJ to analyze physician's testimony and give the opinion great weight, little weight, or even no weight. See Greenspan v. Shalala, 38 F.3d 232, 237 (5th Cir. 1994).

Issue No. 2: Whether the ALJ erred in finding that Freeman retained the residual functional capacity for a significant range of sedentary work.

The standard regarding the RFC determination made by an ALJ is set forth above. Freeman's

second argument is simply that, had the ALJ properly considered the medical opinion of Dr. Sandifer, Freeman would have been assessed an RFC of less than the full range of sedentary work. As the undersigned finds that the ALJ did not improperly consider Dr. Sandifer's opinion, this argument has no merit.

After a review of the entire administrative record and the briefs and exhibits filed by both parties, and pursuant to 42 U.S.C. §405(g), I find that there is substantial evidence in the record as a whole to support the Commissioner's decision of nondisability, and the decision is consistent with relevant legal standards.

## Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that Freeman's appeal be DENIED AND DISMISSED WITH PREJUDICE.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **ten (10) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE**

**SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this 18 day of August, 2005.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE